**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JAMES MADDOCKS, *individually and on behalf of all others similarly situated,*

Plaintiff,

v.

START GIMME, LLC d/b/a GIMME CARE,

Defendant.

Case No.: 8:26-cv-3195

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff James Maddocks, individually and on behalf of all others similarly situated ("Plaintiff"), brings this class action lawsuit against Start Gimme, LLC d/b/a Gimme Care ("Defendant") and alleges, upon personal knowledge as to his own actions and his counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action lawsuit addresses Defendant's improper, unauthorized, and illegal disclosure of users' personally identifiable information ("PII") and/or personal health information ("PHI") (collectively referred to as "PII

and PHI") to third-party advertising platforms and data analytics companies without those users' knowledge or consent.

2. The market for peptide therapeutics sold directly to consumers online—including the GLP-1 receptor agonists semaglutide and tirzepatide, growth-hormone-releasing peptides such as sermorelin, and compounds such as NAD+ and glutathione marketed for energy, longevity, and anti-aging—has experienced explosive growth in recent years, with millions of Americans turning to direct-to-consumer "telehealth" websites to obtain self-administered peptide injections for weight loss, metabolic health, recovery, and anti-aging purposes.[1]

3. Defendant is a participant in this market, operating an online platform that markets and sells compounded peptide products—compounded tirzepatide and semaglutide, sermorelin, glutathione, and NAD+—along with other injectable "wellness" products, directly to consumers across the United States, including in Florida.

4. Defendant owns, maintains, and controls the web domain gimme.care, along with its related subdomains—including intake.gimme.care, through which users complete Defendant's medical intake questionnaire and checkout (collectively, the "Website"). Through the Website, users learn about

[1] Tina Reed, *RFK Jr.'s Peptide Push Could Become Next Wellness Boom*, AXIOS (Apr. 23, 2026), https://www.axios.com/2026/04/23/rfk-peptide-push-glp1-wellness-boom (last visited Oct. 15, 2026).

Defendant's peptide therapies, answer questions about their health, body composition, medical conditions, medications, and health goals, and purchase compounded peptide medications that are shipped to their homes.

5. The Website is, in reality, Defendant's conduit to capture and to transmit the PII and PHI of Website visitors and customers to third-party marketers. Defendant embedded and configured trackers on numerous pages on its Website including, but not limited to, on its intake and treatment-questionnaire pages, and on its checkout pages. On those pages, users reveal the peptide therapy they are seeking, most commonly GLP-1 medication for weight loss. To obtain treatment, they enter their health conditions, body measurements, and medications, along with their names, email addresses, phone numbers, and shipping addresses. Without users' knowledge, third-party marketing companies collect this data, including PII and PHI.

6. As a business that solicits and handles sensitive health information—and that holds itself out as providing access to medical treatment—Defendant has an obligation not to disclose this data without the consent of those who provided it, and to protect the privacy and confidentiality of PII and PHI in its possession, custody, or control.

7. This obligation is not merely ethical—it is embodied in federal and state law, including the standards of medical confidentiality reflected in the Health

Insurance Portability and Accountability Act ("HIPAA") and its Privacy Rule (the "Privacy Rule"), the Federal Trade Commission Act, the Electronic Communications Privacy Act, the Florida Security of Communications Act, the Florida Deceptive and Unfair Trade Practices Act, and the common-law right to privacy.

8. Despite these obligations, Defendant has systematically violated its users' privacy rights by using tracking technologies in its Website that capture and transmit PII and PHI to third parties for marketing and analytics purposes including, but not limited to, selling PII and PHI to advertisers, profiling users without their knowledge, targeting users with advertisements based on their medical conditions, and other improper uses of PII and PHI.

9. These disclosures occur without Website users' knowledge, consent, or authorization, in direct violation of federal and state privacy laws.

10. The unauthorized disclosure of medical information is a fundamental breach of trust in any relationship between a consumer seeking treatment for a health condition and the business purporting to provide it.

11. When users seek peptide therapy through the Website, they reasonably expect that the sensitive health information they reveal in Defendant's medical intake questionnaire—including their weight, body mass index, medical conditions, medications, and the fact that they are seeking prescription weight-

loss or other peptide treatment—will remain confidential between them, Defendant, and the licensed provider who reviews their request.

12. Instead, this information has been shared with technology companies and data brokers who use it for their own commercial purposes.

13. This action seeks redress against Defendant for its unlawful practices and to obtain relief for Plaintiff and other affected parties whose privacy rights have been violated through the unauthorized collection and disclosure of their PII and PHI.

14. Plaintiff brings this action on behalf of himself and the putative Classes defined below to secure redress for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("ECPA"); (ii) violations of the Florida Security of Communications Act, Fla. Stat. § 934.01, *et seq.*; (iii) violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*; (iv) intrusion upon seclusion; and (v) unjust enrichment. Plaintiff seeks damages and injunctive relief, including Court-ordered implementation of industry-standard data-privacy controls, regular compliance audits of data-sharing practices, and comprehensive monitoring services to prevent future unauthorized data transmission to third parties.

## PARTIES

15. Plaintiff James Maddocks is an adult citizen of the State of Florida who lives, and at all relevant times has lived, in New Port Richey, Florida, within Pasco County, and who used the Website and purchased compounded GLP-1 medication from Defendant in or around March 2026.

16. Defendant Start Gimme, LLC is a limited liability company organized and existing under the laws of the State of Delaware, which lists as its address 251 Little Falls Drive, Wilmington, Delaware 19808. Defendant does business as "Gimme Care" and operates the Website.

## JURISDICTION & VENUE

17. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action lawsuit wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. This Court also has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts a claim under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*, and supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

18. This Court has specific personal jurisdiction over Defendant because Defendant purposefully directs its business activities toward Florida and this District, and because Plaintiff's claims arise from those contacts. *See* Fla. Stat. § 48.193(1)(a)1, 2, & 6. Defendant operates an interactive e-commerce Website through which it markets and sells compounded GLP-1 medications to Florida residents, accepts orders from Florida, contracts with providers "licensed in the state where you reside" to serve Florida patients, and fills Florida orders through a Florida-licensed compounding pharmacy and ships its products into Florida.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Plaintiff accessed the Website, communicated with Defendant, and had his communications intercepted and disclosed while located in New Port Richey, Pasco County, Florida, and Defendant shipped the products he purchased into this District. Venue is also proper under 28 U.S.C. § 1391(b)(3) and (c)(2) because Defendant is subject to personal jurisdiction in this District with respect to this action. Assignment to the Tampa Division is proper under Local Rule 1.04(a)–(b) because Plaintiff resides, and the events giving rise to his claims occurred, in Pasco County.

## FACTUAL ALLEGATIONS

### I. DATA TRACKING IN THE DIRECT-TO-CONSUMER PEPTIDE INDUSTRY.

20. Peptides—short chains of amino acids that signal the body to produce hormones, repair tissue, or regulate metabolism—have become one of the fastest-growing categories of consumer health products in the United States.[2]

21. The category spans the GLP-1 receptor agonists marketed for weight loss; growth-hormone-releasing peptides such as sermorelin, ipamorelin, and CJC-1295, marketed for muscle growth, recovery, and anti-aging; "healing" compounds such as BPC-157 and TB-500, marketed for injury recovery; and "longevity" and antioxidant products such as NAD+ and glutathione, marketed for energy, cellular health, and anti-aging.[3] Industry analysts estimate that

---

[2] *Id.*

[3] Habiba Atta, *5 Things to Know About the FDA's Peptide Reversal*, AM. J. MANAGED CARE (Aug. 21, 2026), https://ajmc.com/view/5-things-to-know-about-the-fda-s-peptide-reversal (last visited Oct. 15, 2026) (describing BPC-157, TB-500, CJC-1295, ipamorelin, and other compounded peptides that FDA had placed in "Category 2" of its bulk-drug-substance review before reversing course in February 2026, and noting that gray-market vials from wellness clinics, online retailers, and "research use only" vendors remain "the default source for millions of Americans"); *see also* Lexy Lebsack, *Wellness Briefing: Hims & Hers Plots Rapid Expansion into Peptide Therapies Like BPC-157*, GLOSSY (Aug. 19, 2026), https://www.glossy.co/beauty/wellness/wellness-briefing-hims-hers-plots-rapid-expansion-into-peptide-therapies-like-bpc-157-plus-news/ (last visited Oct. 15, 2026); *see also* Bask Health, *What Are NAD+ Injections and Why Are They Becoming More Visible Online* (May 28, 2026), https://bask.health/blog/what-are-nad-injections (last visited Oct. 15, 2026) (blog post by the telehealth platform through which Defendant furnishes its consultations, observing that NAD+ "has become heavily associated with the broader longevity and wellness movement"

peptides already constitute a market of roughly $140 to $164 billion and project that it will approach $300 billion by 2033.[4]

22. Since the introduction of semaglutide and tirzepatide for weight management, a new category of direct-to-consumer "telehealth" businesses has emerged that markets compounded peptides online, collects consumers' medical information through web-based intake questionnaires, routes those questionnaires to contracted prescribers, fills the resulting prescriptions through compounding pharmacies, and ships self-administered injections to consumers' homes.

23. The largest telehealth companies, including Hims & Hers and Ro, have built peptide programs around GLP-1 medications and are expanding into other compounded peptides, and a long tail of smaller online vendors has followed.[5]

---

and that "[t]elehealth companies have helped normalize at-home wellness delivery models").

[4] Grand View Research, *Peptide Therapeutics Market (2026 - 2033*), https://www.grandviewresearch.com/industry-analysis/peptide-therapeutics-market (last visited Oct. 15, 2026).

[5] Katie Palmer, *How Digital Health Companies Are Capitalizing on the GLP-1 Boom*, CNBC (May 25, 2024), https://www.cnbc.com/2024/05/25/digital-health-companies-are-launching-programs-around-glp-1s-.html (last visited Oct. 15, 2026).

24. Perhaps not surprisingly then, the market for online peptide vendors—often offered through telehealth providers that do not require in-person visits—is extremely competitive.[6]

25. The competitiveness of the industry has led some online peptide vendors to rely heavily on digital advertising for customer acquisition.[7]

26. Unfortunately, the lucrative market around health data has led some companies to devalue customer privacy. A December 2022 investigation by journalists at *The Markup* and STAT News examined 50 direct-to-consumer telehealth companies and found that 49 had third-party tracking code with the potential to collect and to share sensitive health data with various adtech platforms such as Facebook, among many others.[8]

---

[6] Gabby Landsverk, *A Guide to Navigating the Wild West of the Online GLP-1 Market*, MEN'S HEALTH (July 2, 2025), https://www.menshealth.com/health/a65013285/online-glp-1-market/ (last visited Oct. 15, 2026).

[7] Emily Baumgaertner, *Cerebral, Telehealth Startups Face Privacy Pushback over Ad Models*, STAT NEWS (Mar. 22, 2023), https://www.statnews.com/2023/03/22/cerebral-lawsuit-privacy/ (last visited Oct. 15, 2026).

[8] Todd Feathers *et al.*, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited Oct. 15, 2026).

27. On 13 websites, trackers from Meta, TikTok, and other platforms collected patients' answers to medical intake questions about health conditions, medications, and treatment needs.[9]

28. On 25 telehealth sites—including those operated by Hims & Hers, Ro, and Thirty Madison—tracking codes informed tech platforms when users added prescription medications to shopping carts or completed treatment subscriptions.[10]

29. Recognizing the sensitivity of the data shared on health-related websites and the potential for misuse of this information, federal regulators have aggressively pursued digital health companies for improper data sharing.

30. The FTC, for example, has reached major settlements with BetterHelp for sharing mental health data with Facebook, Snapchat, Criteo and Pinterest; GoodRx, for sharing prescription data with Facebook and others; and Cerebral, affecting 3.1 million patients whose data was shared with Meta, TikTok, and others.[11]

---

[9] *Id.*

[10] *Id.*

[11] *See Fed. Trade Comm'n, FTC Proposed Order Prohibits BetterHelp from Revealing Consumers' Data, Including Sensitive Mental Health Information, to Facebook and Others* (Mar. 2, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-ban-betterhelp-revealing-consumers-data-including-sensitive-mental-health-information-facebook (last visited Oct. 15, 2026); *see Fed. Trade Comm'n, FTC Enforcement Action Bars GoodRx from Sharing Consumers' Sensitive Health Info for Advertising* (Feb. 1, 2023), https://www.ftc.gov/news-

31. In July 2023, the FTC and HHS Office for Civil Rights jointly warned 130 hospital systems and telehealth providers about privacy risks from tracking technologies.[12]

32. Despite these enforcement actions, online sellers of peptide therapies continue to extract and sell user data to third parties for advertising purposes without the requisite notice and consent, exploiting the popularity of their products and the sensitivity of their customers' needs in order to profit through undisclosed third-party advertising integrations.

33. Medical and health data is one of the most valuable commodities in the digital economy. Industry analysts project the healthcare analytics market to reach $167.0 billion by 2030.[13]

---

events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising (last visited Oct. 15, 2026); *see Pixel Use Results in Impermissible Disclosure of the PHI 3.1 Million Cerebral Platform Users*, HIPAA JOURNAL (Mar. 13, 2023), https://www.hipaajournal.com/cerebral-impermissible-disclosure-pixel-3170000/ (last visited Oct. 15, 2026).

[12] *Fed. Trade Comm'n, FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies* (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (last visited Oct. 15, 2026).

[13] *Healthcare Analytics Market To Reach $167.0 Billion By 2030*, https://www.grandviewresearch.com/press-release/global-healthcare-analytics-market (last visited Oct. 15, 2026).

34. Individual health records command premium prices in both legitimate and illicit markets, valued as much as fifty times more than credit card information due to their comprehensive nature and permanence.[14]

35. Third-party data brokers embedded in health apps and websites are therefore extremely interested in this valuable data, which they can use to create detailed psychographic profiles for targeted advertisements and predictive modeling, and which can be sold and resold to advertisers, social media companies, or hackers who may use this data to orchestrate social engineering attacks.[15]

## II. USERS' SENSITIVE INFORMATION, INCLUDING HEALTH-RELATED DATA, IS SOLICITED BY AND DIVULGED TO DEFENDANT THROUGH THE WEBSITE.

36. Defendant owns and operates the Website as an online platform that markets and sells compounded peptide therapies directly to consumers.

37. The Website markets GLP-1 products, injectable sermorelin, NAD+, cyanocobalamin (B12), MIC+B12, glutathione, and ondansetron.

[14] *Why Medical Data is 50 Times More Valuable Than a Credit Card*, https://www.cleardata.com/news/medical-data-valuable-credit-card/ (last visited Oct. 15, 2026).

[15] *Id.*

38. Each of these products is marketed with express or implied reference to the health conditions and goals it addresses—weight loss, metabolic health, energy, anti-aging, and the management of treatment side effects.

39. Defendant describes its process in four steps: (1) "Start your online questionnaire"—"Answer a few simple questions about your health and goals for your licensed provider review"; (2) "Get prescribed by a provider"—"A licensed US provider will review your answers and determine if you're eligible"; (3) "Delivered to your door"; and (4) "On-time monthly refills"—"Shipped every 28 days after a short check-in, track and monitor via the online portal."




40. Thousands of people rely on Defendant and its services, including the Website, as their source for peptide therapies—compounded GLP-1 medications,

sermorelin, NAD+, and glutathione—used for weight loss, the management of weight-related health conditions, energy, and anti-aging.

41. Nowhere on the Website's home page, treatment pages, intake questionnaire, or checkout pages are Defendant's patients provided with conspicuous notice of any tracking that occurs on the Website.

42. Nowhere does Defendant tell users, before it begins transmitting their data, that the fact that they are seeking prescription weight-loss medication—and the weight, medical conditions, and medications they disclose in order to obtain it—will be sent to Meta, TikTok, Reddit, Criteo, Microsoft, and other third parties.

43. Unlike an in-person medical visit, the Website requires users to reveal the treatment they are seeking—through treatment-page views and the selection of a GLP-1 program—and then to answer a medical intake questionnaire concerning their height, weight, medical history, current medications, prior GLP-1 use, and weight-loss goals, and to supply their names, email addresses, phone numbers, dates of birth, and shipping and billing addresses in order to complete a purchase, all before they are required to review any privacy policy.

44. The Website contains numerous first- and third-party tracking implementations that record user data. These tracking technologies, including web beacons, pixels, and software development kits, are small pieces of code that developers integrate into their websites to track user behavior and transmit data

to third-party platforms—in this case, transmitting sensitive health-related information for advertising and analytics purposes.

45. Specifically, Defendant has deployed on the Website—including on the intake questionnaire at intake.gimme.care—the Meta Pixel, the TikTok Pixel, the Reddit Pixel, the Criteo OneTag and the Microsoft UET tag, among other third-party tracking tools (collectively, the "Tracking Technology").

46. By installing and using these tracking technologies, developers—including those who created the Website or have been responsible for its maintenance and updates—embed these companies' technologies enabling comprehensive data collection regarding users' treatment selections, questionnaire responses, purchases, and personal identifiers.

***a. Background on the Meta Pixel.***

47. Meta Platforms, Inc. ("Meta") operates Facebook and Instagram, two of the world's largest social media platforms. Meta derives substantially all of its revenue—more than $160 billion in 2024—from selling advertising.[16]

[16] Meta Platforms, Inc., Annual Report (Form 10-K) for the fiscal year ended Dec. 31, 2024 (filed Jan. 29, 2025), https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm (last visited Oct. 15, 2026).

48. Meta provides advertisers with the "Meta Pixel" (formerly the "Facebook Pixel"), a snippet of JavaScript code that advertisers embed in their websites.

49. Meta describes the Pixel as "[a] piece of code that you put on your website" that "will log when someone takes an action" on a website where it is installed, including "adding an item to [a] shopping cart or making a purchase."[17]

50. An embedded Meta Pixel transmits automatically registered events like page views, "standard events"—such as "ViewContent," "Lead," "CompleteRegistration," "AddToCart," "InitiateCheckout," "AddPaymentInfo," and "Purchase"—and "custom events" customized by website operators, each of which may carry parameters describing the content viewed or the action taken, such as the product name, value, and currency.[18]

51. Through "automatic advanced matching," the Pixel scans the website's forms for personal identifiers—including email addresses, phone numbers, names, and addresses—and transmits hashed versions of those

---

[17] Meta Business Help Center, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153 (last visited Oct. 15, 2026).

[18] Meta for Developers, *Meta Pixel – Reference*, https://developers.facebook.com/docs/meta-pixel/reference (last visited Oct. 15, 2026).

identifiers to Meta so that Meta can match the visitor to a Facebook or Instagram account.[19]

52. Hashing does not, by itself, make an email address or phone number anonymous to a platform that can match the hash against identifiers it already holds. Meta holds the email addresses and phone numbers of its billions of account holders; when it receives a hashed identifier that matches one on file, it associates the event with that account.

53. Websites also utilize Custom Audiences to reach people who have taken actions on an advertiser's website and related audience tools to reach other potential customers based on the attributes of Custom Audiences.[20]

54. Meta's Business Tools Terms require advertisers to represent that they "have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data," and that they have provided "robust and sufficiently prominent notice to users regarding Business Tool Data collection,

---

[19] Meta Business Help Center, *About Advanced Matching for Web*, https://www.facebook.com/business/help/611774685654668 (last visited Oct. 15, 2026).

[20] Meta Business Help Center, About website custom audiences, https://www.facebook.com/business/help/610516375684216 (last visited Oct. 15, 2026).

sharing and usage." The Terms place responsibility on advertisers to provide notice and obtain consent where applicable law requires it.[21]

55. Meta's policies also prohibit advertisers from sending it health information through the Pixel. Yet Meta's filtering of such data is, by Meta's own account, defective. Accordingly, it places responsibility on the advertiser for the data an advertiser chooses to send to it through its installation and configuration of the Pixel.

***b. Background on the TikTok Pixel***

56. TikTok Inc. operates a social-media platform and offers advertising tools, including a website Pixel that advertisers can use to measure website activity and campaign performance.[22]

57. TikTok describes its Pixel as code that can be placed on a website to share website events with TikTok. According to TikTok, the tool can measure website traffic and advertising performance and help optimize campaigns and find potential customers.[23]

---

[21] Meta, Meta Business Tools Terms, https://www.facebook.com/legal/terms/businesstools (last visited Oct. 15, 2026).

[22] TikTok for Business, *About TikTok Pixel*, https://ads.tiktok.com/resources/help/article/tiktok-pixel (last visited Oct. 15, 2026).

[23] *Id.*

58. The TikTok Pixel sends website events and related browser and device information to TikTok. TikTok's documentation confirms that it receives timestamps, IP addresses, user agents, cookies, metadata, and button clicks, as well as configured events such as page views, cart actions, and purchases.

59. TikTok's Pixel also collects page metadata and button clicks. For example, the questionnaire requests reproduced below show payload fields for a click trigger, the clicked element's tag and attributes, its position and xpath, and its "inner_text" (the words on the button), along with page and session context. The same automatic click collection, or a similar version of the Pixel that likewise captures user communications through the same capture and payload configuration, is active on every step of Defendant's questionnaire.[24]

60. On a multiple-choice questionnaire, a recorded click event that includes the clicked answer button's "inner_text" can disclose the substance of that selected answer.

61. TikTok's Advanced Matching identifies customer information in form fields or other page sources, hashes qualifying identifiers such as email addresses and phone numbers with SHA-256 in the browser, and associates matched events with TikTok users. For example, as shown below, Defendant's

---

[24] *Id.*

TikTok Pixel requests carried the SHA-256 hashes of the email address and phone number entered into the questionnaire.[25]

62. Implementation of the TikTok Pixel requires the website owner to obtain a pixel identifier from TikTok, integrate the TikTok-provided code, and define the events to be tracked. As part of setting up the pixel, website owners must agree to TikTok's advertising terms, under which owners represent that they have provided notice to and obtained any legally required consent from users before transmitting data to TikTok. TikTok's policy framework thus places the onus on website owners, including Defendant, to ensure they comply with applicable privacy laws.

***c. Background on the Reddit Pixel***

63. Reddit, Inc. operates a social-media platform. Its 2024 annual report reported advertising revenue of $1.185 billion out of $1.300 billion total revenue for the year, approximately 91 percent.[26]

---

[25] TikTok for Business, *About Advanced Matching for Web*, https://ads.tiktok.com/resources/help/article/advanced-matching-web; *How to set up Automatic Advanced Matching*, https://ads.tiktok.com/resources/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Oct. 15, 2026).

[26] Reddit, Inc., *2024 Annual Report (Form 10-K), Business and Financial Statements*, https://www.sec.gov/Archives/edgar/data/1713445/000171344525000018/rddt-20241231.htm (last visited Oct. 15, 2026) (Q4 DAUq and 2024 revenue by source).

64. Reddit's Pixel is JavaScript that advertisers can install on website pages to measure actions visitors take after seeing or clicking Reddit advertisements. The base Pixel reports PageVisit events by default, while additional standard and custom conversion events require configuration. Reddit's Pixel also captures referral data, page or product metadata, the pixel identifier, and request parameters.[27]

65. Reddit's Automated Advanced Matching collects email addresses and phone numbers from displayed text or user input and normalizes and hashes them with SHA-256 for conversion matching.

66. Implementation of the Reddit Pixel requires the website owner to obtain a pixel identifier from Reddit, integrate the Reddit-provided code, and define the events to be tracked. As part of setting up the pixel, website owners must agree to Reddit's advertising terms, under which owners represent that they have provided notice to and obtained any legally required consent from users before transmitting data to Reddit. Reddit's policy framework thus places the onus on website owners, including Defendant, to ensure they comply with applicable privacy laws.

---

[27] Reddit Ads Help, *About the Reddit Pixel*, https://business.reddithelp.com/s/article/reddit-pixel; *Install the Reddit Pixel Directly*, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Oct. 15, 2026).

***d. Background on the Criteo and Microsoft Advertising Trackers***

67. Defendant has also deployed advertising technology operated by Criteo S.A. and Microsoft Corporation.

68. Criteo's OneTag can record product-page and other configured events for advertising and retargeting. A separate cross-device parameter can pass a visitor's email address in a hashed or unhashed format; Criteo describes SHA-256 hashing for matching across devices.[28]

69. Microsoft's Universal Event Tracking ("UET") tag can be placed on a website to measure configured conversions and build remarketing audiences for Microsoft Advertising.[29]

70. Implementation of each of these trackers requires Defendant to obtain an account and identifier from the vendor, place the vendor's snippet in the Website's source code (directly or through a tag manager), and configure the events and parameters to be transmitted. Data is transmitted to these vendors only because Defendant chose to install and configure the trackers in this manner.

---

[28] Criteo, *Introduction to the Criteo OneTag*, https://help.criteo.com/kb/guide/en/introduction-to-the-criteo-onetag-8fjCDwCENw/Steps/775595; *Pass hashed emails through Cross-Device Event*, https://help.criteo.com/kb/guide/en/pass-hashed-emails-through-cross-device-event-cYHxCUc1qv/Steps/1977811 (last visited Oct. 15, 2026).

[29] Microsoft Learn, *Universal Event Tracking*, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking?view=bingads-13 (last visited Oct. 15, 2026).

## III. WEBSITE USERS' PII AND PHI IS INTERCEPTED BY THE WEBSITE'S TRACKING TECHNOLOGY WITHOUT CONSENT.

71. Defendant maintains and owns the Website and has made the conscious and intentional decision to install the Tracking Technology on the Website, thereby allowing the providers of the Tracking Technology and other third-party trackers that may be present on the Website to intercept and to collect users' communications with the Website—including treatment-page views, the selection of a GLP-1 program, responses to Defendant's medical intake questionnaire, and purchases of specific compounded medications—in real time.

72. Individuals who visit the Website are not required to create an account or to affirmatively accept any terms of use or privacy policy before browsing treatment pages, clicking "Get started," or beginning the intake questionnaire, and are not presented with any terms of use, privacy policy, or other page where tracking activities are disclosed. The Tracking Technology begins transmitting data to Meta, TikTok, Reddit, and Defendant's other advertising and analytics vendors the moment the home page loads. An example of the home page as first loaded is reproduced below.




*Figure 1 – gimme.care home page at first load.*

73. Upon accessing the Website, the user is presented with pricing cards and buttons inducing them to "Get started" and "Start your journey." Users view treatment pages and begin the medical intake questionnaire before they have an opportunity to review any terms of service or privacy policy. An example of the treatment page for "Compounded tirzepatide," whose URL (gimme.care/treatments/compounded-tirzepatide) itself identifies the medication, is reproduced below.




*Figure 2 — Compounded tirzepatide treatment page at gimme.care/treatments/compounded-tirzepatide.*

74. Users who click "Get started" are taken to Defendant's intake questionnaire at intake.gimme.care/wl, where they are asked a series of questions concerning their health goals (answered by clicking one of several on-screen buttons, such as "Lose 16 - 50 lbs"), their body composition (height and weight, from which the Website computes their body mass index), their current medical treatment and medications, any prior use of GLP-1 medications, and their medical conditions and history. Most questions are answered by clicking a button bearing the answer. Examples of the questionnaire pages are reproduced below.




*Figure 3 — Intake questionnaire requesting height and weight.*




*Figure 4 — Intake questionnaire medical-conditions screen with the blood-sugar category expanded.*

75. Users who complete the questionnaire are then required to provide PII including their names, email addresses, phone numbers, dates of birth, and shipping and billing addresses, and to enter payment-card information, in connection with an order that identifies the specific compounded medication and plan selected.

76. No checkbox or other mechanism for assenting to Defendant's terms of service (the "Terms of Service") or privacy policy (the "Privacy Policy") is presented at checkout. An example of the checkout page is reproduced below.




*Figure 5 – Checkout contact/shipping screen.*

77. The Tracking Technology is active on every page throughout the treatment-selection, questionnaire, and checkout flow and is set up to capture the

contents of users' communications with the Website and transmit them to at least Meta, TikTok, Reddit, Criteo, and Microsoft.

78. For example, as constructed on the Website, the Meta Pixel transmits to Meta each page the user visits, including the treatment page for the specific compounded GLP-1 medication viewed and each step of the intake questionnaire, together with the "_fbp" browser identifier and, for users logged in to Facebook, the "c_user" Facebook account identifier, so that the user's selection of a weight-loss medication can be joined to the user's Facebook and Instagram profile and identity.

79. Defendant has additionally configured the Pixel to transmit "ViewContent," "Lead," "InitiateCheckout," "AddPaymentInfo," "CompleteRegistration," and "Purchase" events as the user progresses from the treatment page through the questionnaire to checkout and has enabled automatic advanced matching so that the email address, phone number, name, and address the user enters at checkout are hashed and transmitted to Meta.

```
    load_progress: "2"
    referrer: "https://get.gimme.care/start-online-visit/nad-10pc?utm_source=bask_patient
    url: "https://get.gimme.care/start-online-visit/nad-10pc?r=129.00&p=0&q=1&n=NAD%252B%
  page_csid: "1792429965448::2UIE7lgoKoxtwPKdYfCD"
  pageview_id: "fd66585e-cbe4-11f1-8ab9-02001735db22-YuTc7.2.0::2b7e0845-cbe5-11f1-8179-5
▾ pixel: {code: "D7UCQGRC77UEKU3Q21V0", runtime: "1"}
    code: "D7UCQGRC77UEKU3Q21V0"
    runtime: "1"
  session_id: "fd66585e-cbe4-11f1-8ab9-02001735db22::PxLEfuj_Rsve7LLX-dgp-D7UCQGRC77UEKU3
▾ user: {anonymous_id: "01M50TPYK99Z4C47EYYMCR3D0D_.tt.1.1792103119465",…}
    anonymous_id: "01M50TPYK99Z4C47EYYMCR3D0D_.tt.1.1792103119465"
    email: "4c60813c6357715cec87254354b7e247313f93d9d2bdd756bb24f1e285d41a6c"
    phone_number: "be77b313bac6d0e043b524f4028ed964f4392cc2fcb6f3a38105ec0e3c356edf"
  userAgent: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML,
  variation_id: "default::canary"
```


*Figure 6 – URL showing the user's solicitation of nad-10 product on the Website, along with the user's hashed email and phone numbers, which TikTok is able to decipher.*

80. A decoded payload of a TikTok request is reproduced above, showing that after a user has entered his or her email and phone number, the recognizable, hashed versions of that data, other identifiers like the "anonymous_id," and specific URLs that indicate a patient's product selection, indications of medical conditions, and progress toward making a purchase, are all simultaneously transmitted to TikTok. The screenshot above shows a decoded request with an example of these transmissions.

81. Similar processes occur throughout the user's journey. The decoded payload of a TikTok Pixel "AddToCart" request fired after an email address and phone number were entered is reproduced below. Its "user" block contains an "eb_email" field and an "eb_phone_number" field, each populated with the SHA-

256 hash of the email address and phone number typed into the questionnaire, together with the same values repeated in an identity-parameter array sourced from "aam_dl_hash_em" and "aam_dl_hash_ph"—TikTok's labels for hashed email and phone supplied through advanced matching from the page's data layer.




*Figure 7: An "add to cart" event, i.e. a user's purchase of an item from Gimme, transmitted alongside the user's hashed email and phone number ("eb_email' and "eb_phone_number").*

*[Remainder of page intentionally left blank]*

82. Hashing does not truly anonymize an identifier to a vendor able to compare it with known values. TikTok compares the hashes it receives against the email addresses and phone numbers of its account holders and, upon a match, associates the request with that account; because every request in the session carries the same TikTok "anonymous_id" and session identifiers, that match links the user's earlier questionnaire answers to the same account.

83. The TikTok Pixel also tracks users before they have entered an email or phone number. The decoded payload of a TikTok request is reproduced below, showing that when an answer button labeled "Lose 16 - 50 lbs" is clicked in response to the questionnaire's question about the user's weight-loss goal, the TikTok Pixel transmitted to TikTok an "auto_collected_properties" object recording that the request was triggered by a "Click" ("page_trigger: Click") on a "BUTTON" whose "inner_text" was "Lose 16 - 50 lbs," together with the button's CSS attributes, its screen position, its xpath within the page, and identifiers used by TikTok to recognize and profile advertising subjects. The "anonymous_id" parameter used here by TikTok is not genuinely anonymous, but is a unique identifier assigned to a visitor or app user without requiring that person to log in.

```
▾ Request Payload    View source
▾ {event_id: "", message_id: "messageId-1792127658285-1535712716116", is_onsite: false,…}
   action: "Click"
  ▾ auto_collected_properties: {page_trigger: "Click",…}
     page_trigger: "Click"
    ▾ trigger_element: {tag: "BUTTON", attributes: {,…}, inner_text: "Lose 16 - 50 lbs",…}
      ▾ attributes: {,…}
         class: "group/choice flex w-fullitems-centercursor-pointer select-nonetouch-manipulationoverflow-hidden
         type: "button"
       inner_text: "Lose 16 - 50 lbs"
       num_child_buttons: 0
      ▾ position: {x: 506, y: 398.8125}
         x: 506
         y: 398.8125
       tag: "BUTTON"
       timestamp: "2026-10-16T05:14:18.276Z"
       xpath: "/HTML/body[1]/div[2]/div[1]/div[2]/div[1]/div[1]/div[2]/div[1]/div[2]/button[1]"
  ▾ context: {ad: {sdk_env: "external", jsb_status: 2}, device: {platform: "pc"},…}
    ▾ ad: {sdk_env: "external", jsb_status: 2}
       jsb_status: 2
       sdk_env: "external"
    ▾ device: {platform: "pc"}
       platform: "pc"
     index: 0
    ▾ library: {name: "pixel.js", version: "2.2.1"}
       name: "pixel.js"
       version: "2.2.1"
    ▾ page: {url: "https://intake.gimme.care/wl/intro", referrer: "", load_progress: "2"}
       load_progress: "2"
       referrer: ""
       url: "https://intake.gimme.care/wl/intro"
     pageview_id: "6c2e4581-c920-11f1-890c-eac7dd44d2ca-Ypl0R.0.0::6c2e3ec9-c920-11f1-890c-eac7dd44d2ca"
    ▾ pixel: {code: "D7UCQGRC77UEKU3Q21V0", runtime: "1", codes: "D7UCQGRC77UEKU3Q21V0"}
       code: "D7UCQGRC77UEKU3Q21V0"
       codes: "D7UCQGRC77UEKU3Q21V0"
```



```
     pageview_id: "6c2e4581-c920-11f1-890c-eac7dd44d2ca-Ypl0R.0.0::6c2e3ec9-c920-11f1-890c-eac7dd44d2ca"
    ▾ pixel: {code: "D7UCQGRC77UEKU3Q21V0", runtime: "1", codes: "D7UCQGRC77UEKU3Q21V0"}
       code: "D7UCQGRC77UEKU3Q21V0"
       codes: "D7UCQGRC77UEKU3Q21V0"
       runtime: "1"
     session_id: "6c2e4581-c920-11f1-890c-eac7dd44d2ca::liuay70qkmPpSPJFJJkh"
    ▾ sessions: [{csid: "1792127628917::nk15RClS2cCNREoxJzPC", page_csid: "1792127628917::ltmuQZ3sz2TjLGX4Hhv6",…}]
      ▸ 0: {csid: "1792127628917::nk15RClS2cCNREoxJzPC", page_csid: "1792127628917::ltmuQZ3sz2TjLGX4Hhv6",…}
    ▾ user: {anonymous_id: "01M51J2XKKR9YF648DHYC8Z5J8_.tt.1.1792127628916"}
       anonymous_id: "01M51J2XKKR9YF648DHYC8Z5J8_.tt.1.1792127628916"
```


*Figure 8 — TikTok Network → Payload click event with inner_text "Lose 16 - 50 lbs." and a continuation crop of the same TikTok goal-click request as the preceding figure showing visitor identifier "anonymous_id" and page-identifying "pageview_id."*

84. The words "Lose 16 - 50 lbs" are the substance of the user's answer to a medical intake question about the amount of weight the user is seeking to lose with prescription GLP-1 medication—information that the user communicated to

Defendant for the purpose of obtaining medical treatment, and that Defendant simultaneously communicated to TikTok.

85. Because the TikTok Pixel's automatic click collection is active on every step of the questionnaire, the same mechanism transmits to TikTok the text of every answer button a user clicks—including answers to questions about the user's medical conditions, current medications, prior GLP-1 use, and eligibility—and the URL of each step, which itself identifies the question being answered. Once the user has entered his email address and phone number into the questionnaire—which Defendant requires before the user may learn whether he is eligible for treatment—the TikTok Pixel transmits those identifiers to TikTok as well.

86. The Meta Pixel is configured the same way. On the intake questionnaire pages, Defendant's Meta Pixel transmitted "PageView" events to Meta's servers at www.facebook.com/tr reporting the questionnaire page URL ("dl") and the referring page on gimme.care ("rl"), together with Meta's persistent "_fbp" browser identifier and hashed "ud" ("user data") matching parameters so that Meta matches the user's browser and visit to a user's identity through their Facebook or Instagram account and attributes the user's visit to Defendant's GLP-1 intake questionnaire to that account. A decoded request is reproduced below:

× Headers **Payload** Preview Response Initiator Timing Cookies ⚠

**▾ Query String Parameters** View source View URL-encoded

| | |
|---|---|
| id | 965325712619798 |
| ev | PageView |
| dl | https://intake.gimme.care |
| rl | https://gimme.care |
| if | false |
| ts | 1792074860200 |
| iw | false |
| sw | 1512 |
| sh | 982 |
| cud[cn] | ^^ |
| ncud[cn] | ** |
| ud[cn] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| ncud[country] | ** |
| ud[country] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| aud[cn][0][v] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| aud[cn][0][s] | 0 |
| aud[country][0][v] | 79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621 |
| aud[country][0][s] | 0 |
| v | 2.9.419 |
| r | stable |
| a | tmSimo-GTM-WebTemplate-2.0.8-fcg-REINIT |
| ec | 9 |
| o | 12316 |
| aems | 0;0 |
| fbp | fb.1.1792074581149.16805011687246607.AQYAAQMC |
| eid | ob3_plugin-set_a7b8ee6cc6ad001309aec5fad83fc4b0298b0292353e16a49a7bd6caa4772608 |
| pm | 1 |
| hrl | 6d8f83 |
| ler | other |
| plt | 529.6000000238419 |
| ups[pv] | {} |
| ups[rpv] | {} |
| it | 1792074860185 |

*Figure 9 — Meta PageView request on intake.gimme.care with country matching fields and a browser identifier.*

87. The Meta Pixel deployed on the same pages also captures the user's questionnaire responses—through Meta's "SubscribedButtonClick" and "Microdata" automatic events—and transmits those responses to Meta as the user answers each question.

88. Defendant also transmits users' identities and intake activity to Reddit. On the questionnaire's eligibility step (intake.gimme.care/wl/eligibility), Defendant's Reddit Pixel transmitted to Reddit's servers a "Lead" conversion event under Defendant's Reddit pixel identifier. The request's form data included the page URL and referrer, the page's title and metadata ("Intake – Gimme," "Intake Form"), Reddit's persistent visitor identifier, and—in the "auto_em" and "auto_pn" parameters—the SHA-256 hashes of the email address and phone number entered into the questionnaire. A decoded request is reproduced below.

*[Remainder of page intentionally left blank]*




*Figure 10 – Reddit Lead request with auto_em and auto_pn in the continuation panel.*

89. A "Lead" event is Reddit's label for a completed sign-up or inquiry. By transmitting it from the eligibility step together with the user's hashed email address and phone number, Defendant told Reddit, in substance, that an identifiable person had applied for prescription GLP-1 weight-loss medication—information Defendant never disclosed it would share with Reddit at all.

90. As the screenshots above show, the Meta, TikTok, and Reddit pixels capture the sensitive health information and unique identifiers that users reveal through selecting, qualifying for, and purchasing compounded GLP-1 medications and transmit this data to those third parties; the Criteo and Microsoft trackers deployed on the same pages transmit user data to Criteo and Microsoft in the same manner.

91. Therefore, individuals who use the Website are tracked and uniquely identified through the third parties' capture of their identifying characteristics like email address and phone number, as well as through methods of identifying users like Meta's, TikTok's, and Reddit's hashed-identifier matching.

92. At no point in the treatment-selection, questionnaire, or checkout process is the user presented with any disclosure, either explicit or constructive, that Tracking Technology is present on every page to capture the medication the user seeks, the answers the user gives to Defendant's medical questions, and the purchase the user makes, or that any web tracking tool collects user data to create personalized, identifiable profiles combining the sensitive data entered on the Website with users' broader web browsing activity.

## IV. DEFENDANT'S INTERCEPTIONS WERE INTENTIONAL AND PURPOSEFUL AND WERE UNDERTAKEN TO COMMIT TORTIOUS AND CRIMINAL ACTS.

93. Congress enacted the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, and directed the Secretary of

Health and Human Services to promulgate standards protecting the privacy of individually identifiable health information. The resulting Privacy Rule, 45 C.F.R. Parts 160 and 164, is the federal floor of medical confidentiality in the United States and reflects the settled societal expectation that information about a person's health, treatment, and medical purchases will be held in confidence.

94. The Privacy Rule defines "individually identifiable health information" ("IIHI") as information, including demographic information, that "[i]s created or received by a health care provider, health plan, employer, or health care clearinghouse" and that "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual," and that "identifies the individual" or as to which "there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. IIHI that is transmitted or maintained in electronic or any other form is "protected health information." *Id.*

95. Whether or not a particular business is itself directly regulated by the Privacy Rule, HIPAA and its implementing regulations define the categories of health information that American law treats as confidential, and they inform the reasonable expectation of privacy that attaches when a person discloses such information to obtain medical treatment.

96. That expectation is also protected by Florida common law. Florida recognizes the tort of intrusion upon seclusion, which is committed when one intentionally intrudes, physically or electronically, into a place or matter in which another has a reasonable expectation of privacy, in a manner that would be highly offensive to a reasonable person. The tort reaches the electronic appropriation and dissemination of a person's private communications no less than a physical intrusion into a private space.

97. Where a party to a communication intercepts it for the purpose of committing that tort—here, the subsequent disclosure of users' private health communications to advertising platforms, a purpose distinct from the act of interception itself—the party exception to the Electronic Communications Privacy Act does not apply.

98. The information Defendant captured—questionnaire answers about weight, medical conditions, and medications, the treatment a user selected, and the user's purchase of prescription medication—is among the most private information a person possesses. It is the kind of information HIPAA defines as individually identifiable health information, 45 C.F.R. § 160.103, and the kind of information a reasonable person discloses to a health care service only on the understanding that it will be held in confidence.

99. Defendant's capture and disclosure of that information constitutes an intrusion upon seclusion under Florida law in at least the following respects:

a. Plaintiff and Class members had a reasonable expectation of privacy in their communications with the Website. Defendant solicits users' health information for the stated purpose of enabling licensed providers to determine eligibility and prescribe treatment, holds itself out as providing confidential, provider-supervised medical care and "discreet" delivery, and maintains that information in its patient portal for transmission to those providers and pharmacies.

b. Defendant intentionally intruded upon that seclusion by configuring the Tracking Technology to capture Plaintiff's and Class members' communications on the treatment-selection, questionnaire, and checkout pages as they were made, and by transmitting their contents to Meta, TikTok, Reddit, Criteo, and Microsoft without Plaintiff's or Class members' knowledge or consent.

c. The intrusion would be highly offensive to a reasonable person. A person seeking prescription weight-loss medication would be outraged to learn that the service he trusted with his weight, medical conditions, and medication request was simultaneously reporting that information to social-media and advertising companies so that he could be profiled and targeted with advertisements.

100. Questionnaire answers about weight, medical conditions, and medications concern a user's health, and treatment selections and purchases concern health care and payment. Because each transmission carried persistent browser and visitor identifiers and, as to TikTok and Reddit, the SHA-256 hashes of the user's email address and phone number, there is at minimum a reasonable

basis to believe the information can be used to identify the individual; the transmissions are therefore individually identifiable health information and, having been transmitted electronically, PHI.

101. Defendant's disclosures of that PHI to TikTok, Meta, Reddit, Criteo, and Microsoft were not for treatment, payment, or health care operations. They were for marketing: to measure the performance of Defendant's advertising, to build audiences of people seeking weight-loss medication, and to retarget those people with advertisements.

102. Defendant obtained no authorization or consent from Plaintiff or any Class member for those disclosures, and no statement in a footer-linked document that users are never shown is one. Each such disclosure was therefore a knowing and intentional intrusion into private matters in which Plaintiff and Class members held a reasonable expectation of privacy, undertaken for Defendant's commercial advantage.

103. In the alternative, and in addition, to the extent Defendant creates, receives, maintains, or transmits users' health information on behalf of the licensed health care providers and pharmacies in its network—whose intake questionnaire it administers and to whom it transmits users' responses so that they may determine eligibility and prescribe—Defendant is a "business associate" of those covered entities within the meaning of 45 C.F.R. § 160.103 and is directly subject

to the Privacy Rule. 42 U.S.C. § 17934; 45 C.F.R. § 164.502(a)(3). A business associate may not disclose PHI for marketing or sell PHI without the individual's written authorization. 45 C.F.R. §§ 164.502(a)(5)(ii), 164.508(a)(3). Defendant's disclosures of Plaintiff's and Class members' PHI to Meta, TikTok, Reddit, Criteo, and Microsoft for marketing purposes, without any such authorization, therefore also violated HIPAA and the Privacy Rule, and each knowing disclosure for commercial advantage constituted a federal crime under 42 U.S.C. § 1320d-6(a)(3) and (b)(3).

104. Defendant installed and configured the Tracking Technology for that purpose. The Meta Pixel, the TikTok Pixel, the Reddit Pixel, the Criteo OneTag, and the Microsoft UET tag have no function other than to disclose website visitors' activity to the companies that operate them so that those companies can use it for advertising. The interception of Plaintiff's and Class members' communications was therefore not an end in itself; it was the means by which Defendant accomplished a separate and subsequent unlawful act—the disclosure, sale, and use of Plaintiff's and Class members' PHI for commercial advantage, in violation of Plaintiff's and Class members' common-law right to privacy and, in the alternative, of HIPAA—that Defendant intended from the moment it placed the tracking code on the Website.

105. Defendant's interceptions were likewise undertaken for the purpose of committing additional acts that are criminal and tortious under Florida law: the disclosure and use of electronic communications intercepted without the consent of all parties, which is a third-degree felony under Fla. Stat. § 934.03(1), (4)(a); and unfair and deceptive trade practices in violation of Fla. Stat. § 501.204.

106. Defendant was on notice that its conduct was unlawful. The FTC's BetterHelp, GoodRx, and Cerebral actions and the July 2023 joint FTC–HHS letter to 130 hospital systems and telehealth providers predate Defendant's formation in May 2025, and Defendant holds itself out as a provider of confidential, provider-supervised medical care. Defendant nonetheless chose to deploy the Tracking Technology on the pages where its users disclose their health information.

## V. REPRESENTATIVE PLAINTIFF'S EXPERIENCE.

107. Plaintiff James Maddocks currently resides (and at all times herein relevant has resided) in New Port Richey, Pasco County, Florida.

108. In or around March 2026, while living and physically present in New Port Richey, Florida, Plaintiff accessed the Website to obtain compounded tirzepatide for weight loss.

109. During this visit, Plaintiff viewed the treatment page for compounded tirzepatide, clicked "Get started," and completed Defendant's medical intake questionnaire, in which he disclosed—by clicking the on-screen

answer buttons—his treatment goals (weight loss), body composition (height and weight), his current medications, his prior use (if any) of GLP-1 medications, and his medical conditions and history.

110. Plaintiff entered his email address and phone number into the questionnaire in order to receive his eligibility determination, and then completed a purchase of compounded tirzepatide, which required him to input his name, date of birth, shipping and billing address, and payment-card information.

111. Defendant's contracted provider approved Plaintiff's request, and Defendant shipped compounded tirzepatide to Plaintiff's home in New Port Richey, Florida.

112. As Plaintiff completed each step of the intake process on the Website, the Tracking Technology present on each of those pages captured in real time the health information he communicated to Defendant, including his goal to lose weight; his selection of compounded tirzepatide as a medication to help him lose weight—and disclosed those communications to unauthorized third parties. The Tracking Technology also disclosed the text of each answer button he clicked in response to Defendant's medical questions, including communications concerning his height and weight, current medications, prior GLP-1 use, and medical conditions and history; his eligibility for this prescription and his lack of any medical conditions that would prevent it; and the "AddToCart,"

"InitiateCheckout," "AddPaymentInfo," and "Purchase" events generated when he added compounded tirzepatide to his cart and completed his purchase of that medication which were disclosed to third parties like Meta, TikTok, and Reddit.

113. At no point before or during this process was Plaintiff provided with any notice or means to consent (*i.e.*, a link to Defendant's Terms of Service or Privacy Policy presented for his review and affirmative acceptance) to his treatment selection, questionnaire responses, and purchase information being recorded and transmitted to third parties. Nor was he provided with any notice that this recording was taking place.

114. The Tracking Technology likewise captured in real time the PII Plaintiff entered into the questionnaire and at checkout, including his email address, phone number, name, date of birth, and shipping and billing address.

115. Simultaneously, and without Plaintiff's knowledge or consent, the Tracking Technology captured each of those communications and transmitted them to third parties together with the identifiers each recipient uses to recognize and profile advertising subjects. The TikTok Pixel transmitted to TikTok the SHA-256 hashes of Plaintiff's email address and phone number (in the "eb_email" and "eb_phone_number" fields and the corresponding "aam_dl_hash_em" and "aam_dl_hash_ph" identity parameters), the "anonymous_id" visitor identifier and session identifiers TikTok assigned to Plaintiff's browser, the URL of each

questionnaire step (which included his seeking the compounded tirzepatide), and the "inner_text" of each answer button Plaintiff clicked, which also indicated his selection of compounded tirzepatide. The Meta Pixel transmitted to Meta the URL of each page Plaintiff visited ("dl") and the referring page ("rl"); "PageView," "ViewContent," "Lead," "InitiateCheckout," "AddPaymentInfo," "CompleteRegistration," and "Purchase" events; Meta's persistent "_fbp" browser identifier; the "c_user" identifier for Plaintiff's Facebook account; and the hashed "ud" advanced-matching parameters containing Plaintiff's email address, phone number, name, and address. The Reddit Pixel transmitted to Reddit a "Lead" conversion event from the eligibility step together with Reddit's persistent visitor identifier, the page URL, title, and metadata, and the SHA-256 hashes of Plaintiff's email address and phone number in the "auto_em" and "auto_pn" parameters. The Criteo OneTag and Microsoft UET tag transmitted Plaintiff's activity on the treatment, questionnaire, and checkout pages to Criteo and Microsoft, respectively, together with the persistent identifiers those vendors maintain.

116. Plaintiff did not click on, view, or otherwise access any hyperlinks to Defendant's Terms of Service, Privacy Policy, or any similar page during the visit.

117. Plaintiff proceeded from the Website's "Get started" button through the questionnaire and checkout by clicking the answer and action buttons presented on each screen; he did not scroll to the footer of the gimme.care pages

or to the bottom of the questionnaire or checkout screens, and the references to the Terms of Service and Privacy Policy were not displayed to him. Had they been on his screen, their size and color would not have drawn his attention to them.

118. Plaintiff was never presented with, and never checked, any box indicating agreement to Defendant's Terms of Service or Privacy Policy and never clicked any button or took any other affirmative action indicating consent to have his data captured by the Tracking Technology present on every page of the Website, or to have his communications intercepted by third parties when he used the Website.

119. The Tracking Technology described above was deployed on the Website, including on the intake questionnaire and checkout pages, at the time of Plaintiff's visit in March 2026. Plaintiff was unaware at the time that his information was being captured in real time by the Tracking Technology present on every page of the Website and disclosed to Meta, TikTok, Reddit, Criteo, and Microsoft, which collect user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website with users' web browsing activity.

120. Had he known that Defendant was using the Tracking Technology on every page of the Website to capture the medication he sought, the medical information he disclosed, and the purchase he made, and that he would be

targeted with advertisements on the basis of that information, and that Meta, TikTok, Reddit, Criteo, and Microsoft collect user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website with his web browsing activity, Plaintiff would not have used the Website or would have used it differently, and would not have paid the price he paid for Defendant's program.

121. Following his use of the Website, Plaintiff began receiving targeted advertisements for GLP-1 weight-loss medications and related products on other websites he visited.

122. The advertisements are the foreseeable product of the data flows alleged above: the Tracking Technology told Meta, TikTok, Reddit, and Defendant's other vendors that Plaintiff—identified by his hashed email address and phone number and by the persistent identifiers those vendors maintain—was a person seeking prescription GLP-1 medication, and those vendors did with that information exactly what they exist to do.

123. As a result of Defendant's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of loss of control over his private health data, increased anxiety due to unknown parties accessing sensitive data, loss of the benefit of the bargain in keeping or exchanging his private data, overpayment for a program whose price included Defendant's promise of

confidentiality that Defendant did not keep, and other harms related to the undisclosed and non-consenting transmission of PHI and PII.

## CLASS ACTION ALLEGATIONS

124. Plaintiff, on behalf of himself and all others similarly situated, seeks relief under Federal Rule of Civil Procedure 23 on behalf of the following class and subclass (together the "Classes"):

> **<u>The Nationwide Class (the "Nationwide Class" or "Class"):</u>**
>
> All individuals in the United States who, during the applicable class period, accessed the Website and viewed information about, submitted an intake questionnaire regarding, or purchased a medication or treatment, and whose communications with the Website were transmitted to one or more third parties through the Tracking Technology.
>
> **<u>The Florida Subclass (the "Florida Subclass" or "Subclass"):</u>**
>
> All members of the Nationwide Class who accessed the Website while located in Florida.

125. The following people are excluded from the Class and Subclass: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class or Subclass;

(iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

126. Plaintiff reserves the right to revise or amend the Class definitions based on the discovery of new information.

127. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, it is estimated to number in the tens of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

128. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

129. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced

in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

130. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

a. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*;

b. Whether Defendant violated the Florida Security of Communications Act, Fla. Stat. § 934.03;

c. Whether Defendant's use of the Tracking Technology is an unauthorized interception of electronic communications;

d. Whether Defendant intercepted Class members' communications for the purpose of committing a tortious act—the intrusion upon their seclusion through the disclosure of their private health communications to third parties—such that the party exception of 18 U.S.C. § 2511(2)(d) does not apply;

e. Whether, in the alternative, Defendant is a business associate of the health care providers and pharmacies in its network such that its disclosures of Class members' health information violated HIPAA and its Privacy Rule and constituted a criminal act under 42 U.S.C. § 1320d-6;

f. Whether Website users were on inquiry notice of, or manifested assent to, Defendant's Privacy Policy or Terms of Service;

g. Whether Defendant's representations and omissions concerning the confidentiality of users' health information were deceptive or unfair within the meaning of the Florida Deceptive and Unfair Trade Practices Act;

h. Whether Defendant's conduct constitutes an intrusion upon seclusion;

i. Whether Defendant was unjustly enriched by collecting and monetizing Class members' PHI; and

j. Whether Plaintiff and Class members are entitled to damages and injunctive relief.

131. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary injury suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

132. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendant obtained proper consent before recording users' interactions with the Website or recording users' information through the Website;

b. Whether Defendant's actions violated Website visitors' reasonable expectations of privacy; and

c. Whether Defendant's collection of personal and medical information through tracking technology constitutes an invasion of privacy.

133. Finally, all members of the proposed Classes are readily ascertainable as Defendant has access to Class members' names, emails, and physical addresses.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2510, *et seq.***
***(On Behalf of Plaintiff & the Nationwide Class)***

134. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

135. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant.

136. The ECPA protects both the sending and receipt of communications.

137. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

138. A violation of the ECPA occurs where any person:

> "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication."

18 U.S.C. §§ 2511(1)(a), (c)-(d).

139. The ECPA also provides that:

> [A] person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication . . . while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

18 U.S.C. § 2511(3)(a).

140. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

141. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

142. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

143. Whenever Plaintiff and Class members interacted with the Website and viewed, qualified for, and purchased compounded GLP-1 medications, Defendant, through the Meta Pixel, the TikTok Pixel, the Reddit Pixel, and the other Tracking Technology it embedded in the Website, contemporaneously and intentionally intercepted the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, and redirected such contents to third parties other than an addressee or intended recipient of such communication.

144. Whenever Plaintiff and Class members interacted with the Website, Defendant, through at least the Meta, TikTok, Reddit, Criteo, and Microsoft tracking technologies embedded on the Website, contemporaneously and

intentionally divulged the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to each third party other than an addressee or intended recipient of such communication.

145. Defendant intentionally intercepted and used the contents of Plaintiff's and Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from, Plaintiff's and Class members' health-related communications by transmitting the contents to third parties for marketing analytics and behavioral targeting purposes.

146. Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of sharing the sensitive health information contained therein with third parties.

147. The ECPA's exception for interceptions by a party to the communication does not apply. Under 18 U.S.C. § 2511(2)(d), it is unlawful for a party to intercept a communication, or for a person to intercept with one party's consent, where "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

148. Defendant intercepted Plaintiff's and Class members' electronic communications for the purpose of committing a tortious act in violation of the

laws of the State of Florida: the intentional intrusion upon Plaintiff's and Class members' seclusion, accomplished by disclosing their private communications concerning their weight, medical conditions, medications, and requests for prescription treatment to third-party advertising platforms, without authorization and for commercial advantage, in a manner highly offensive to a reasonable person. That conduct constitutes the common-law tort of intrusion upon seclusion.

149. Plaintiff and Class members had a reasonable expectation of privacy in the questionnaire responses, treatment selections, and purchase information they communicated to the Website, which Defendant solicited for the stated purpose of providing provider-supervised medical treatment; Defendant intentionally captured that information and disclosed it to undisclosed third parties for marketing purposes without Plaintiff's or Class members' knowledge, authorization, or consent; and that intrusion would be highly offensive to a reasonable person.

150. In the alternative, and in addition, to the extent Defendant is a business associate of the licensed health care providers and pharmacies in its network, Defendant intercepted Plaintiff's and Class members' electronic communications for the purpose of committing a criminal act in violation of the laws of the United States: the knowing disclosure of individually identifiable health information to third parties, without authorization and for commercial

advantage, in violation of HIPAA and its Privacy Rule, 45 C.F.R. §§ 164.502(a), 164.502(a)(5)(ii), 164.508(a)(3), which is a federal crime under 42 U.S.C. § 1320d-6(a)(3) and (b)(3).

151. That tortious (and, in the alternative, criminal) purpose was independent of the interception itself. Defendant did not install the Tracking Technology in order to listen; it installed the Tracking Technology in order to hand what it heard to advertising platforms and to profit from doing so. The interception was the means; the unlawful disclosure, sale, and commercial use of Plaintiff's and Class members' PHI was the end, and Defendant intended that end when it placed each vendor's code on the Website and configured the events and identifiers to be transmitted.

152. Defendant's interceptions were also undertaken for the purpose of committing additional criminal and tortious acts in violation of the laws of Florida, including the disclosure and use of electronic communications intercepted without the consent of all parties, a felony of the third degree under Fla. Stat. § 934.03(1), (4)(a); and unfair and deceptive trade practices in violation of Fla. Stat. § 501.204.

153. Defendant intercepted Plaintiff's and Class members' electronic communications for purposes other than fulfilling Plaintiff's and Class members' requests for treatment, without authorization or consent and knowing or having

reason to know that the electronic communications were obtained in violation of the ECPA.

154. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Class members were damaged by Defendant's conduct in that:

a. Defendant harmed Plaintiff's and Class members' interest in privacy;

b. Sensitive and confidential health information that Plaintiff and Class members intended to remain private between them and Defendant is no more;

c. Defendant eroded the essential confidential nature of its relationship to Website users;

d. Defendant took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class members did not get the full value of the products and services for which they paid, which included Defendant's duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiff's and Class members' personal health information.

155. Plaintiff, individually and on behalf of the Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages under 18 U.S.C. § 2520(c)(2), punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT**
**Fla. Stat. § 934.01, *et seq.***
***(On Behalf of Plaintiff & the Florida Subclass)***

156. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

157. Plaintiff brings this claim individually and on behalf of the members of the Florida Subclass against Defendant.

158. The Florida Security of Communications Act ("FSCA"), Fla. Stat. § 934.01, *et seq.*, was enacted to protect the privacy of wire, oral, and electronic communications in Florida. The Legislature declared that "[t]o safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction." Fla. Stat. § 934.01(4).

159. The FSCA makes it unlawful for any person to (a) "[i]ntentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept any wire, oral, or electronic communication"; (c) "[i]ntentionally disclose[], or endeavor[] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral,

or electronic communication in violation of this subsection"; or (d) "[i]ntentionally use[], or endeavor[] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." Fla. Stat. § 934.03(1)(a), (c), (d).

160. Unlike its federal counterpart, the FSCA contains no exception for interceptions by a party to the communication. Instead, it is lawful for a person to intercept an electronic communication only "when all of the parties to the communication have given prior consent to such interception." Fla. Stat. § 934.03(2)(d). Florida is thus an "all-party consent" state.

161. The FSCA defines "intercept" as "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device"; "contents" to include "any information concerning the substance, purport, or meaning of that communication," and "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(3), (7) & (12).

162. A court in this District has held, at the pleading stage, that tracking pixels deployed on a health care provider's website intercept the "contents" of a

patient's communications where they transmit the substance of what the patient tells the website about his health, the treatment he is seeking, and who he is. *W.W. v. Orlando Health, Inc.*, 2025 WL 722892 (M.D. Fla. Mar. 6, 2025) (information conveyed to a health system's website about the plaintiff's "medical conditions and providers" was "the message Plaintiff sought to convey to Defendant" and "thus constitutes the substance, purport, or meaning of her communications").

163. Fla. Stat. § 934.10(1) provides that "[a]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of ss. 934.03-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use, such communications."

164. At all relevant times, Plaintiff and the members of the Florida Subclass were physically located in Florida when accessing and using the Website, and the interceptions alleged herein occurred in Florida, at the point where Plaintiff's and Subclass members' browsers transmitted their communications. Plaintiff's and Florida Subclass members' communications with Defendant through the Website constitute "electronic communications" within the meaning of Fla. Stat. § 934.02(12), and the contents of those communications that were intercepted included:

a. The user's weight-loss goal;

b. The user's medical condition;

c. The user's medication history;

d. The medication the user is requesting from Defendant, conveyed by the questionnaire-step URLs that accompany each answer;

e. The identity of the person making those statements, conveyed by the SHA-256 hashes of the email address and telephone number the user typed into the questionnaire, by which the third parties associate the foregoing statements with a specific individual.

165. Each of items (a) through (d) is the substance, purport, and meaning of what the user said to Defendant—the "contents" of the user's communication under Fla. Stat. § 934.02(7)—and not a record of the user's movement through the Website; item (e) is what ties those contents to the person who communicated them. Nor is any of them excluded from the definition of "electronic communication" by Fla. Stat. § 934.02(12)(c), which carves out "[a]ny communication from an electronic or mechanical device which permits the tracking of the movement of a person or an object." The communications at issue are the user's statements to Defendant. They originate from the user, not from any device, and no tracking device is their source.

166. Through the Tracking Technology embedded on the Website, Defendant procured third parties to intercept, and in the alternative itself intercepted, Plaintiff's and Florida Subclass members' electronic communications contemporaneously with their transmission, by causing a duplicate of the contents of those communications to be transmitted to the third parties' servers at the same

moment the communications were transmitted to Defendant. The duplicate transmission is fired by the same browser event that transmits the user's answer to Defendant; it is dispatched from the user's browser in the same browser event, and within the same millisecond (Fig. 8), as the transmission of the user's answer to Defendant. The acquisition is contemporaneous with the transmission.

167. The Tracking Technology constitutes an "electronic, mechanical, or other device" within the meaning of Fla. Stat. § 934.02(4). It is code that Defendant caused to execute in the user's browser, which acquires the contents of the user's communications to Defendant and transmits a copy of those contents to third-party servers at the moment of transmission. It falls within no exclusion in Fla. Stat. § 934.02(4).

168. Meta, TikTok, Reddit, Criteo, and Microsoft are not parties to the user's communications with Defendant. Defendant procured each of them to intercept those communications by installing their code on the Website, configuring it to execute on the treatment, questionnaire, and checkout pages, and enabling the automatic-collection and advanced-matching features through which that code acquires the contents of the user's statements. Fla. Stat. § 934.03(1)(a) makes it unlawful to "procure[] any other person to intercept or endeavor to intercept" a communication, and § 934.10(1) provides a civil action against one who "procures any other person or entity to intercept, disclose, or use" it.

169. In the alternative, Defendant itself intercepted the communications through the code it caused to execute in the user's browser.

170. Under either theory the interception was unlawful, because Fla. Stat. § 934.03(2)(d) permits interception only when all parties to the communication have given prior consent, and Plaintiff and Florida Subclass members never consented to any acquisition of their statements by Meta, TikTok, Reddit, Criteo, or Microsoft.

171. Defendant further intentionally disclosed the contents of Plaintiff's and Florida Subclass members' intercepted communications to Meta, TikTok, Reddit, Criteo, and Microsoft, and intentionally used those contents—for advertising measurement, audience building, retargeting, and analytics—knowing or having reason to know that the contents were obtained through the interception of electronic communications in violation of Fla. Stat. § 934.03(1).

172. Defendant's interception of Plaintiff's and Florida Subclass members' electronic communications was accomplished without the prior consent of all parties to the communication. Specifically:

a. Interception begins immediately upon accessing the Website and continues with every questionnaire answer, before any opportunity for users to provide informed consent;

b. Defendant never obtained express consent from Plaintiff or Florida Subclass members before intercepting their communications;

c. The Website solicits—and intercepts—users' treatment-page requests, questionnaire answers, and checkout information before users create an account or review the Privacy Policy;

d. Defendant never provided clear, conspicuous notice that users' electronic communications revealing health-related information would be intercepted and shared with third parties;

e. The only references to Defendant's Privacy Policy and Terms of Service are footer hyperlinks placed below the fold, which users are never required to pass, rendered in small, low-contrast type that is not reasonably calculated to be seen even when on screen, and no user is asked to check a box, click through, or otherwise manifest assent to either document; and

f. Any purported consent was ineffective because the interception began before consent could be obtained, because no document describing Defendant's data-sharing practices was ever presented to users for review or acceptance, and because a disclosure buried in a footer-linked document that users are never shown is not the "prior consent" of "all of the parties" that Fla. Stat. § 934.03(2)(d) requires.

173. The intercepted communications include highly sensitive medical information that Plaintiff and Florida Subclass members provided with reasonable expectations of privacy and confidentiality, including:

a. The specific compounded GLP-1 medication and program sought, selected, and purchased;

b. The fact that the user was seeking prescription treatment for weight loss or a weight-related medical condition;

c. Medical conditions, medical history, and current medications disclosed by selecting answer buttons in Defendant's intake questionnaire and, upon information and belief, the height, weight, and body mass index entered there; and

d. The email addresses and phone numbers entered into the questionnaire, transmitted in hashed form, and, upon information and belief, the names, dates of birth, and shipping and billing addresses entered at checkout, each linked to those disclosures and purchases.

174. Defendant's conduct was willful and intentional, as Defendant deliberately implemented the Tracking Technology knowing it would intercept users' electronic communications without the consent of all parties.

175. As a direct and proximate result of Defendant's violations of the FSCA, Plaintiff and Florida Subclass members have suffered concrete injury in fact.

176. The Tracking Technology disclosed to Meta, TikTok, Reddit, Criteo, and Microsoft private facts about their health—the weight they sought to lose, the medical conditions they reported, the medications they had taken, and the prescription medication they were requesting—linked to identifiers for the person who disclosed them.

177. The unauthorized disclosure of private medical facts to third parties is an injury that bears a close relationship to the harms redressed by the common-

law tort of intrusion upon seclusion, and it has long been recognized as a basis for suit in American courts. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). That injury was complete upon the disclosure, does not depend on any downstream use of the information, and exists independently of the statutory violation.

178. Plaintiff continues to desire to obtain GLP-1 medication online but has a reasonable fear that his electronic communications will continue to be intercepted without consent if he uses the Website.

179. Each communication intercepted in violation of the FSCA is a separate violation. In the alternative, each day on which Plaintiff's or a Florida Subclass member's communications were intercepted is a separate day of violation. For each violation, Plaintiff and Florida Subclass members are entitled under Fla. Stat. § 934.10(1) to:

a. Such preliminary or equitable or declaratory relief as may be appropriate, Fla. Stat. § 934.10(1)(a);

b. Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher, Fla. Stat. § 934.10(1)(b);

c. Punitive damages, Fla. Stat. § 934.10(1)(c); and

d. A reasonable attorney's fee and other litigation costs reasonably incurred, Fla. Stat. § 934.10(1)(d).

180. Unless enjoined by this Court, Defendant will continue to intercept the electronic communications of Florida Subclass members and other Website visitors without their consent, causing irreparable harm for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
**Fla. Stat. § 501.201, *et seq.***
***(On Behalf of Plaintiff & the Florida Subclass)***

181. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

182. Plaintiff brings this claim individually and on behalf of the members of the Florida Subclass against Defendant.

183. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

184. FDUTPA is to be "construed liberally" to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). In construing FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade

Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act." Fla. Stat. § 501.204(2).

185. Plaintiff and the Florida Subclass members are "consumers" within the meaning of Fla. Stat. § 501.203(7), and Defendant's marketing and sale of compounded GLP-1 medications and related services through the Website constitute "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

186. Defendant engaged in deceptive acts and practices in violation of FDUTPA by representing, expressly and by implication, that users' health information would be kept confidential—including by promising "[d]iscreet" delivery, by presenting the Website as the front door to a confidential relationship with a "licensed US provider," and by marketing a program whose price "includes everything you need; consultation, care, medication, supplies, shipping and support"—while simultaneously transmitting that health information to Meta, TikTok, Reddit, Criteo, and Microsoft for advertising and analytics purposes, and by omitting to disclose, at or before the point of collection, that it would do so. These representations and omissions were likely to mislead, and did mislead, consumers acting reasonably in the circumstances.

187. Defendant also engaged in unfair and unconscionable acts and practices in violation of FDUTPA. The Federal Trade Commission has determined—in its enforcement actions against BetterHelp, GoodRx, Cerebral,

and others, and in its July 2023 joint guidance with HHS—that the undisclosed use of tracking pixels and similar technologies to transmit consumers' health information to advertising platforms is an unfair practice under Section 5 of the FTC Act, because it causes substantial injury to consumers that is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits to consumers or competition. Defendant's practices are the same practices the FTC has condemned, and they offend established public policy—including the policy embodied in the FSCA—and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

188. Defendant's deceptive and unfair practices were material: a reasonable consumer deciding whether to disclose his weight, medical conditions, and medications to an online GLP-1 vendor, and whether to pay that vendor's price, would consider it important that the vendor would transmit that information to Meta, TikTok, and Reddit.

189. As a direct and proximate result of Defendant's deceptive and unfair practices, Plaintiff and Florida Subclass members suffered actual damages. Plaintiff and Florida Subclass members paid for a GLP-1 program whose price included, and whose value depended upon, the confidential handling of their medical information; the program they received—one in which their medical information was transmitted to advertising platforms—was worth less than the

program they paid for, and Plaintiff and Florida Subclass members would not have paid the price they paid, or would not have purchased at all, had Defendant's practices been disclosed. Plaintiff and Florida Subclass members also suffered the diminution in value of their personal and health information, which has independent economic value that Defendant appropriated.

190. Pursuant to Fla. Stat. § 501.211(1), Plaintiff and Florida Subclass members, as persons aggrieved by Defendant's violations of FDUTPA, are entitled to a declaratory judgment that Defendant's practices violate FDUTPA and to an injunction prohibiting Defendant from continuing those practices.

191. Pursuant to Fla. Stat. § 501.211(2), Plaintiff and Florida Subclass members, as persons who have suffered a loss as a result of Defendant's violations of FDUTPA, are entitled to recover their actual damages, plus attorney's fees and court costs as provided in Fla. Stat. § 501.2105.

## FOURTH CAUSE OF ACTION

### INTRUSION UPON SECLUSION
***(On Behalf of Plaintiff & the Florida Subclass)***

192. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

193. Plaintiff brings this claim individually and on behalf of the members of the Florida Subclass against Defendant.

194. Florida recognizes the common-law tort of intrusion upon seclusion, which is committed when one intentionally intrudes, physically or electronically, into a place or matter in which another has a reasonable expectation of privacy, in a manner that would be highly offensive to a reasonable person.

195. Plaintiff and Florida Subclass members had a reasonable expectation of privacy in their communications with the Website concerning their weight, medical conditions, medications, and request for prescription weight-loss treatment—information that is among the most private that a person possesses, and that is protected by a web of federal and state privacy laws.

196. Defendant intentionally intruded upon that seclusion by deploying the Tracking Technology to electronically capture Plaintiff's and Florida Subclass members' communications as they were made, and by transmitting them to Meta, TikTok, Reddit, Criteo, and Microsoft, without Plaintiff's or Florida Subclass members' knowledge or consent.

197. Defendant's intrusion would be highly offensive to a reasonable person. A reasonable person seeking prescription weight-loss medication through a service that promises "discreet" delivery and a confidential relationship with a licensed provider would be outraged to learn that the service was simultaneously reporting that person's weight, medical conditions, and medication request to

social-media and advertising companies so that the person could be profiled and targeted with advertisements.

198. As a direct and proximate result of Defendant's intrusion, Plaintiff and Florida Subclass members suffered injury, including the loss of privacy in their medical information, mental anguish and distress, and the loss of the value of their personal and health information, and are entitled to compensatory damages, punitive damages for Defendant's willful and wanton conduct, and injunctive relief.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT
*(On Behalf of Plaintiff & the Nationwide Class)*

199. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

200. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant, in the alternative to his claims at law.

201. Defendant has been unjustly enriched at the expense of Plaintiff and Class members through its unauthorized collection, use, and monetization of their PHI and personal data.

202. Plaintiff and Class members conferred a benefit upon Defendant by paying for Defendant's GLP-1 program and by providing valuable PHI, including the health conditions, body measurements, and medications revealed by their

intake-questionnaire responses and purchases, and personal identifiers, through their use of the Website. Defendant had knowledge of and voluntarily accepted and retained those benefits.

203. Individual health records command premium prices in data markets, valued as much as 50 times more than credit card information due to their comprehensive nature and permanence.

204. Health information commands exceptional value due to its predictive power and marketing utility.

205. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' PHI to third parties through embedded technology without authorization or consent.

206. Defendant has been unjustly enriched through several mechanisms:

a. Data Monetization: Defendant derives commercial value from sharing users' PHI with third parties for marketing analytics, behavioral targeting, and user profiling purposes, including lower customer-acquisition costs and more effective retargeting of prospective patients;

b. Cost Avoidance: Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable health data;

c. Competitive Advantage: Defendant gained unfair competitive advantages by leveraging detailed health-data profiles to optimize its platform and marketing without

bearing the costs associated with compliant data collection; and

d. Enhanced Platform Value: The unauthorized collection of comprehensive user health data increases the overall value and effectiveness of Defendant's platform.

207. Defendant obtained this benefit through unlawful interception and unauthorized disclosure of PHI in violation of the ECPA, the FSCA, and FDUTPA.

208. Whereas Plaintiff and Class members provided this valuable information and paid Defendant's price in the context of seeking treatment for personal health conditions with a reasonable expectation of privacy, Defendant actively concealed its data collection and sharing practices from users who were unaware their health information was being intercepted and monetized.

209. Defendant's retention of these benefits violates fundamental principles of fairness and equity, as Defendant has profited from the unauthorized exploitation of some of the most sensitive and valuable personal information—PHI—without providing any compensation or benefit to the individuals whose privacy was violated.

210. Plaintiff and Class members have no adequate remedy at law for Defendant's unjust enrichment, as they cannot recover the specific value of their appropriated health data through traditional damages calculations.

211. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and Class members are entitled to restitution and disgorgement of all

benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their PHI.

212. Plaintiff and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff James Maddocks, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant Start Gimme, LLC d/b/a Gimme Care and in favor of Plaintiff and the Classes, and grant the following relief:

A. Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

B. Enter a judgment finding that Defendant's actions, as described herein, violate the Electronic Communications Privacy Act (18 U.S.C. § 2510 *et seq.*), the Florida Security of Communications Act (Fla. Stat. § 934.01 *et seq.*), and the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*), and constitute an intrusion upon seclusion;

C. Award injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Classes including: (i) an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein; (ii) an order requiring Defendant to implement proper notice and consent mechanisms before using tracking technology; and (iii) an order requiring Defendant to destroy, and to

direct its vendors to destroy, all data collected through unlawful monitoring practices;

D. Award to Plaintiff and the Nationwide Class damages as authorized by the Electronic Communications Privacy Act, 18 U.S.C. § 2520(c)(2): the greater of actual damages plus any profits attributable to the violation, or statutory damages of the greater of $100 per day for each day of violation or $10,000, subject to the Court's statutory discretion;

E. Award liquidated damages to Plaintiff and the Florida Subclass under the Florida Security of Communications Act, Fla. Stat. § 934.10(1)(b), in the amount of the greater of $100 per day for each day of violation or $1,000, or actual damages, whichever is higher, together with punitive damages under Fla. Stat. § 934.10(1)(c);

F. Award actual damages to Plaintiff and the Florida Subclass under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211(2);

G. Award compensatory and punitive damages to Plaintiff and the Florida Subclass for Defendant's intrusion upon seclusion;

H. Award restitution and disgorgement of Defendant's unjust enrichment, including all revenue derived from its unlawful business practices;

I. Award Plaintiff and the Classes reasonable litigation expenses and attorneys' fees, including under 18 U.S.C. § 2520(b)(3), Fla. Stat. §§ 934.10(1)(d) and 501.2105;

J. Award Plaintiff and the Classes pre- and post-judgment interest to the extent allowable; and

K. Award such other and further relief as equity and justice may require.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff demands a trial by jury for all issues so triable.

Dated: October 21, 2026

Respectfully submitted,

*<u>/s/ Matthew J. Langley</u>*
Matthew J. Langley (Fla. Bar No. 97331)
*Lead Counsel for Plaintiff*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, IL 60614
Tel: (773) 554-9354
matt@almeidalawgroup.com

*Attorney for Plaintiff & the Putative Classes*